IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 15-00359-01-CR-W-DGK |
| JAVIER PULIDO-AYALA, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS

Before the court is Defendant's Motion to Suppress Evidence. Defendant moves the Court to suppress all evidence obtained from the October 8, 2015, traffic stop and all statements he made during the stop on grounds of Fourth Amendment violations. For the following reasons, Defendant's motion should be denied.

### *I. BACKGROUND*

An indictment was returned on November 4, 2015, charging Defendant with one count of aiding and abetting possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On January 6, 2016, Defendant filed a motion to suppress (Doc. No. 25). The government responded on January 13, 2016 (Doc. No. 29). An evidentiary hearing was held on April 20, 2016. The government appeared by Assistant United States Attorney Brent Venneman. Defendant was present, represented by appointed counsel Anita Burns. The government called the following witnesses: Missouri Highway Patrol Sergeant Robert Brooks McGinnis; Lafayette County Sheriff's Department Detective Donald K. Hammond; and Missouri Highway Patrol Trooper Dan Schubert. Defendant called

1

Commercial Vehicle Inspector Brian Sanders to testify. The following exhibits were admitted into evidence:

    Government's Exhibit 1:    Photograph of checkpoint signs;
    Government's Exhibit 2:    Map of I-70 at Route T;
    Government's Exhibit 3:    Dash cam video;
    Government's Exhibit 4:    2014 canine certification;
    Government's Exhibit 5:    2015 canine certification; and

    Defendant's Exhibit 3:    Trooper Schubert's electronic incident report.

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. On October 8, 2015, the Missouri Highway Patrol and Lafayette County Drug Task Force set up a ruse checkpoint on I-70 (Tr. at 4-5, 69). A ruse checkpoint is designed to identify persons who may be transporting drugs (Tr. at 5, 69). As part of the operation, law enforcement set up four road signs along the interstate (Tr. at 6). Two of the signs read, "DRUG CHECKPOINT ¼ MILE AHEAD"; the other two read, "K-9 IN USE PERRO DE DROGA" (Tr. at 6, 8; Gvt. Exh. 1).

2. The two signs that read "DRUG CHECKPOINT ¼ MILE AHEAD" were placed four or five seconds ahead of the exit ramp off of the interstate onto T Highway, one in the median and the other on the shoulder (Tr. at 6, 9-10). The two signs referencing a drug dog were placed at the beginning of the exit ramp (Tr. at 6-7, 9-10).

3. These signs were set up to be seen by vehicles traveling east on I-70 (Tr. at 7). Law enforcement chose this exit because there were no amenities for which drivers may be exiting (Tr. at 6).

4. Lafayette County Sheriff's Department Detective Donald Hammond's

2

assignment in the operation was to monitor the interstate, exit ramps and roadways that cross over the interstate (Tr. at 6). He was positioned at T Highway, just south of I-70, were he could observe eastbound traffic (Tr. at 7). Detective Hammond was approximately 400 feet from the stop sign at the top of the exit ramp, and used a spotting scope mounted to the driver's side window of his vehicle to observe traffic (Tr. at 16-17).

     5.     At approximately 8:25 a.m., Detective Hammond observed a red Mini Cooper traveling east in the far left lane of I-70 (Tr. at 11). As the Mini Cooper approached the exit ramp to T Highway, it made an abrupt jerk to the right -- leaving the left lane, crossing the right lane and barely making it to the exit ramp, all at a high rate of speed and without using a turn signal (Tr. at 11, 17, 20). The vehicle did not stop at the stop sign at the top of the exit ramp, but slowed just enough to turn north onto T Highway and continue driving (Tr. at 11-12, 18-19, 21). The Mini Cooper then turned left to get back on the interstate traveling west (Tr. at 12).

     6.     Detective Hammond called out over the radio a description of the vehicle and the fact that it had not used a turn signal while exiting the interstate and did not stop at the stop sign at the top of the exit ramp (Tr. at 13, 20, 26). Based on these reported traffic violations, Missouri Highway Patrol Trooper Dan Schubert and Commercial Vehicle Officer Brian Sanders began to pursue the Mini Cooper to perform a traffic stop (Tr. at 13, 26, 29, 40, 96-97). Trooper Schubert did not personally observe any of the traffic violations (Tr. at 40).

     7.     Trooper Schubert activated his lights and sirens and followed the Mini Cooper for a couple of miles before it stopped (Tr. at 28). He did not run the vehicle's license plate during this period (Tr. at 41).

8. At approximately 8:25 a.m., the vehicle pulled over (Tr. at 49; Gvt. Exh. 3 at 8:25:15). Trooper Schubert approached the passenger window of the Mini Cooper for safety reasons, and asked for a driver's license, registration and insurance information (Tr. at 29-31; Gvt. Exh. 3). Trooper Schubert then asked Defendant, the driver, to accompany him back to the patrol vehicle so they could have a conversation in a safer, quieter environment (Tr. at 31; Gvt. Exh. 3).

9. Trooper Schubert observed that the Mini Cooper had a California license plate and did not have a lot of luggage in the vehicle (Tr. at 31, 45). He testified it was not uncommon to see vehicles on I-70 with out-of-state plates (Tr. at 41).

10. Due to the driver's abrupt exit off of I-70 upon passing the signs about a drug checkpoint and change in route the opposite direction, Trooper Schubert believed there might be other criminal activity going on (Tr. at 32, 33).

11. Trooper Schubert advised Defendant he had been stopped for failing to stop at a stop sign (Tr. at 43-44; Gvt. Exh. 3 at 8:26:57). Defendant did not speak English so, approximately two or three minutes after Defendant got into the patrol vehicle, Trooper Schubert utilized Google Translate to establish communication (Tr. at 34; Gvt. Exh. 3 at 8:27:04-8:32:52).

12. Trooper Schubert did not ask Defendant again why he failed to stop at the stop sign or if he had read the signs advising of the drug checkpoint (Tr. at 44, 47-48). Instead, he inquired about Defendant's travel plans (Tr. at 32). Trooper Schubert testified he commonly asks this question during a traffic stop, even when he does not suspect the vehicle is transporting drugs (Tr. at 40).

13. Trooper Schubert first asked Defendant where he was coming from and to

what location he was traveling (Tr. at 36; Gvt. Exh. 3 at 8:32:52-8:34:32). Defendant responded he was traveling to Connecticut (Tr. at 36; Gvt. Exh.3). He further conveyed that he turned and began traveling westbound because he was looking for breakfast (Tr. at 36; Gvt. Exh. 3 at 8:35:47-8:36:21). Defendant stated he had left Los Angeles yesterday (Tr. at 37; Gvt. Exh. 3 at 8:33:20-8:33:27). Trooper Schubert found the circumstances of the trip Defendant described to be suspicious, as it was a very long road trip to cover so quickly (Tr. at 37).

14. Based on Trooper Schubert's experience from previously working on interdiction teams and encountering individuals who were transporting drugs on I-70, he believed Defendant was transporting some type of drug (Tr. at 38). Specifically, Defendant was coming from a known source area, was traveling a long distance with very few stops, exited for breakfast at a location where there were no amenities and Defendant's abrupt change of direction at the drug checkpoint (Tr. at 38-39).

15. Officer Sanders had remained with and spoke to the passenger of the vehicle during this time (Tr. at 46).

16. Missouri Highway Patrol Sergeant McGinnis had also been made aware of the traffic violations and the location of the Mini Cooper based on Detective Hammond's radio report (Tr. at 70). Sergeant McGinnis has 891 hours of classroom and practical interdiction training (Tr. at 67). He also has experience in conducting interdiction stops and operations (Tr. at 68). Sergeant McGinnis has recovered controlled substances from cars that have been stopped and is familiar with the differences between quantities of controlled substances for use versus quantities for distribution (Tr. at 68).

17. Sergeant McGinnis found Defendant's driving behavior suspicious based

5

upon his years of experience (Tr. at 70). Sergeant McGinnis testified that he had been involved in the seizure of multiple "loads" of illegal drugs where the driver exited with similar traffic violations (Tr. at 70). He further testified that drivers draw attention to themselves after seeing the signs by exiting; many times they fail to signal, fail to stop at a stop sign or make aggressive lane changes (Tr. at 70-71).

18. At 8:35, approximately ten minutes after the initial stop and while Trooper Schubert was speaking with Defendant in his patrol vehicle, Sergeant McGinnis arrived at the scene with his K-9, Jampy (Tr. at 37, 38, 71, 72; Gvt. Exh. 3 at 8:35:17).

19. Trooper Schubert had not requested Sergeant McGinnis come to the traffic stop but was aware that he was doing so based on a brief radio conversation (Tr. at 37, 62, 71-72).

20. Sergeant McGinnis did not immediately get Jampy out of the vehicle (Tr. at 72-73; Gvt. Exh. 3). Instead, he first asked Trooper Schubert if he got the translation program to work then went to the Mini Cooper and began talking to the passenger through the window (Tr. at 73). The passenger stated he was traveling from Los Angeles to Connecticut for Defendant's cousin's wedding (Tr. at 74). The passenger did not know the cousin's name, whether the cousin was a male or a female, or the city in Connecticut to which they were traveling (Tr. at 74). Sergeant McGinnis testified the passenger could not sit still during this brief conversation (Tr. at 74).

21. Based on the way in which the Mini Cooper exited I-70 and returned traveling westbound, the fact that they were traveling 1,600 miles over a 24-hour period, the passenger's lack of knowledge about who they were going to see and whether it was a male or female getting married and his personal experience in interdiction, Sergeant

6

McGinnis suspected criminal activity (Tr. at 75-76).

22. Jampy is trained to detect the odor of marijuana, cocaine, heroin and methamphetamine (Tr. at 76-77). He is certified through the Missouri Police K-9 Association (Tr. at 78; Gvt Exhs. 4, 5). Jampy has proven reliable over the two years that Sergeant McGinnis has been his handler (Tr. at 78).

23. Sergeant McGinnis informed the passenger of the Mini Cooper that Jampy was going to perform a narcotics sniff and asked if he wanted to remain inside the vehicle; the passenger chose to get out (Tr. at 80). As the passenger exited the vehicle, Officer Sanders had his hand on the passenger door (Tr. at 89, 98-99; Gvt. Exh. 3 at 8:37:40). The passenger never touched the car door to shut it (Tr. at 98; Gvt. Exh. 8:37:40-8:38:05).

24. Sergeant McGinnis did not intend for the passenger's door to be left open and he did not instruct Officer Sanders to leave it open (Tr. at 83). Sergeant McGinnis' preferred practice is for vehicle doors to be shut prior to conducting a K-9 sniff (Tr. at 83, 89). Sergeant McGinnis did not ask anyone to close the door (Tr. at 90-91).

25. Sergeant McGinnis had his back to the Mini Cooper with the intention of walking Jampy around the vehicle clockwise, starting on the driver's side (Tr. at 81). At approximately 8:38 a.m., Sergeant McGinnis told Jampy to "find it," which is the signal that instructs Jampy to begin the search (Tr. at 81-83, 91; Gvt. Exh. 3). Jampy immediately pulled Sergeant McGinnis toward to open door on the passenger's side and alerted at the fender area (Tr. at 83, 87, 93; Gvt. Exh. 3 at 8:38:37). Sergeant McGinnis testified he did not direct Jampy into the open car door (Tr. at 83-84).

26. Sergeant McGinnis pulled Jampy back, trying to get him out of the

opening to walk him clockwise around the vehicle (Tr. at 84).   Jampy immediately went back to the same location and alerted (Tr. at 84, 93-94; Gvt. Exh. 3 at 8:38:44-8:38:54).

27.     At the time the dog sniff commenced, Trooper Schubert was not aware of any inconsistencies between Defendant and the passenger's stories (Tr. at 47).

28.     Sergeant McGinnis put Jampy back in his vehicle (Tr. at 85; Gvt. Exh. 3 at 8:38:54).   A roadside search of the Mini Cooper was conducted (Tr. at 85; Gvt. Exh. 3 at 8:41:18-9:16:05).   When no controlled substances were found, Jampy was deployed a second time and again alerted at the same location (Tr. at 85-86; Gvt. Exh. 3 at 8:50:30).

29.     At approximately 9:21 a.m., Trooper Schubert ran the license plate on the vehicle (Tr. at 48-49, 51; Def. Exh. 3).

30.     At approximately 9:23 a.m., the Mini Cooper was moved to Wilkinson's Tow lot so that a more thorough search could be conducted (Tr. at 85, 87-88; Gvt. Exh. 3 at 9:23:20).

31.     At approximately 12:05 p.m., three kilograms of cocaine were found in a false compartment of the Mini Cooper (Tr. at 84; Def. Exh. 3).   The cocaine was found after a plastic piece of paneling on the back side of the Mini Cooper was removed, allowing law enforcement to use a scope to see packages of drugs inside the fender (Tr. at 88-89).

32.     At approximately 3:13 p.m., law enforcement ran Defendant's driver's license (Tr. at 52; Def. Exh. 3).

33.     Defendant was given a verbal warning for the traffic violations (Tr. at 45, 62).

## III. LEGAL ANALYSIS

Defendant seeks suppression of all evidence obtained from the traffic stop. He argues he was unlawfully seized, as the manner and duration of the seizure exceeded the initial justification for the stop. Defendant also seeks to suppress his statements as fruits of the alleged violations.

"An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." United States v. Luna, 368 F.3d 876, 878 (8th Cir. 2004). See also United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008) ("The subjective belief of the officer that there might be illegal drugs in the vehicle does not invalidate the stop."); United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)(involving abrupt lane change without signaling). When there are multiple officers involved, "probable cause may be based on their collective knowledge . . . as long as there is some degree of communication." United States v. Robinson, 664 F.3d 701, 703 (8th Cir. 2011)(quoting United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011)).

In this case, Detective Hammond observed Defendant abruptly change lanes on I-70 without using a turn signal and fail to stop at the stop sign at the top of the exit ramp to T Highway. Detective Hammond broadcast these traffic violations over the radio, which was heard by Trooper Schubert. Probable cause thus existed for the traffic stop.

After a lawful stop, law enforcement is "entitled to conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" Bloomfield, 40 F.3d at 915 (quoting United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and

purpose." Id. (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)).

Once Defendant pulled over, Trooper Schubert did just this. He asked Defendant for his driver's license, registration and insurance information. He then asked Defendant to accompany him back to the patrol vehicle so they could talk in a safer, quieter environment. Upon ascertaining that Defendant did not speak English, Trooper Schubert used Google Translate to ask Defendant about his travel plans. Defendant told Trooper Schubert that he had left Los Angeles the day before and was traveling to Connecticut; he had exited I-70 because he was looking for breakfast. This exchange was prolonged due to the language barrier. Based on Trooper Shubert's previous experience with interdiction teams, the fact that Defendant was coming from a known source area, traveling a long distance with very few stops, his abrupt change in direction at the drug checkpoint and explanation that he was looking for breakfast despite there being no amenities at that exit, Trooper Schubert believed Defendant was transporting drugs.

If a law enforcement officer "develops a reasonable, articulable suspicion of criminal activity beyond the reason for the traffic stop, the officer may expand the scope of the inquiry and detain the occupants of the automobile for further investigation." United States v. Poulack, 236 F.3d 932, 936 (8th Cir. 2001). Reasonable suspicion is determined "by examining the totality of the circumstances, in light of the officer's experience." Id. Eighth Circuit case law supports that the above factors constitute the requisite reasonable suspicion. In United States v. Carpenter, the Court held that a vehicle with out-of-state plates that exited just beyond ruse checkpoint signs "at least beg[a]n to raise a reasonable inference that the driver may have departed the highway without a destination in mind because he was carrying drugs and wanted to avoid the purported checkpoint." 462 F.3d 981, 987 (8th Cir. 2006)(citing United States v.

Brugal, 209 F.3d 353, 359-61 (4th Cir. 2000). The Carpenter Court went on to hold that the level of suspicion "was reasonably heightened when [the defendant] claimed to be looking for a gas station, even though he had a quarter of a tank of gas and had taken an exit with no available services." Id.

Sergeant McGinnis arrived at the scene 8:35 a.m., approximately ten minutes after the initial stop and conducted a K-9 sniff. The sniff commenced at approximately 8:38 a.m. -- just three minutes after Sergeant McGinnis arrived and thirteen minutes after Defendant pulled over. Defendant's detention throughout this period was reasonable.

The use of a 'drug-sniffing dog on the exterior of a vehicle during a valid traffic stop does not infringe on any Fourth Amendment rights." United States v. Williams, 429 F.3d 767, 772 (8th Cir. 2005). As soon as Sergeant McGinnis instructed Jampy to "find it," Jampy alerted at the fender area of the Mini Cooper's open door.

"Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment." United States v. Lyons, 486 F.3d 367, 373 (8th Cir. 2007). "Therefore, a dog's instinctive jump into a car does not violate the Fourth Amendment as long as the canine enters the vehicle on its own initiative and is neither encouraged, placed, nor facilitated by law enforcement officers." United States v. Irvin, No. 07-20557, 2012 WL 5817903 at *6 (E.D. Mich. Sept. 20, 2012)(citing Untied States v. Sharp, No. 10-6127, 2012 WL 3047338 at *2 (6th Cir. July 27, 2012)). See also United States v. Stone, 866 F.2d 359, 364 (10th Cir. 1989)(holding canine's entry into a car through an open hatchback did not violate the Fourth Amendment as there was no evidence that "the police asked [the defendant] to open the hatchback" or that "the police handler encouraged the dog to jump in the car"). Law enforcement officers so not have an affirmative duty to close the door. See Lyons, 486 F.3d at

11

373 (stating "Appellants do not cite to any authority that hold that the officers had the affirmative duty to close the windows in preparation for the dog sniff, and we find none.").

Here, I do not find that Sergeant McGinnis encouraged or facilitated Jampy's entrance inside the threshold of the car. Rather, the testimony adduced during the suppression hearing and the dash cam video of the stop demonstrate Jampy's actions were of his own initiative. Despite Sergeant McGinnis' attempts to walk Jampy around the vehicle, Jampy returned twice to the open door -- alerting each time.

"A dog sniff that results in a positive alert provides "probable cause that drugs are present." Bloomfield, 40 F.3d at 919. "Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement." Id. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007)(quoting United States v. Ross, 456 U.S. 798, 825 (1982)). Probable cause does not "'dissipate' simply because it [takes] a long time to complete a reasonable and thorough search of the car" or because the search is not "completed on the shoulder of the road." Id. at 512, 513. As a result, neither the initial search of the Mini Cooper on I-70 nor the more thorough search at Wilkinson's Tow Lot violated the Fourth Amendment.

## IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from

the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 22, 2016